UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | | |
|---|---|---|
| MOYE, O'BRIEN, O'ROURKE, HOGAN & PICKERT, | : | CASE NO.: 6:02-cv-126-Orl-31KRS |
| Plaintiff, | : | |
| v. | : | |
| NATIONAL RAILROAD PASSENGER CORPORATION, | : | JULY 21, 2003 |
| Defendant. | : | |

**PLAINTIFF'S CONSOLIDATED MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR ORDER**

**I.     INTRODUCTION**

Pursuant to Rule 3.01(a) of the Rules of the United States District Court for the Middle District of Florida, the plaintiff respectfully submits this memorandum in opposition to the defendant's motion to dismiss plaintiff's FOIA requests for electronic mail and other computer data dated July 2, 2003, and in support of plaintiff's motion for Order. Because this Court has already rejected the defendant's "failure to exhaust administrative remedies" argument with regard to the e-mail request three prior times, the defendant's resurrection of this argument borders on being obstructionist. Furthermore, the factual and procedural history of the electronic data issue presented by the defendant itself in its motion and supporting exhibits mandates the conclusion that the parties have



attempted in good faith to resolve this issue and, having failed to reach a satisfactory resolution, have requested assistance from this Court. Because the plaintiff has not "abandoned" its request for electronic mail and other computer data, the motion to dismiss should be denied.

## II. FACTS AND PROCEDURAL HISTORY OF THE E-MAIL ISSUE

In support of its motion to dismiss, Amtrak argues that, despite the fact that it has made "repeated attempts" to accommodate the plaintiff's request for electronic records, the plaintiff has failed to respond to Amtrak's search proposals, and has failed to pay requested fees to process this requests. Def.'s Mot. to Dismiss at p. 1. The defendant states: "because this failure constitutes abandonment of its requests under agency regulations, plaintiff has failed to exhaust its administrative remedies under the FOIA and its requests should be dismissed. ..." Id. Amtrak has argued previously in this litigation that the plaintiff failed to exhaust its administrative remedies with respect to the electronic data request. *See, e.g.* defendant's Motion to Dismiss in Part for Failure to Exhaust Administrative Remedies dated August 30, 2002. In its earlier motion to dismiss, Amtrak argued that because the plaintiff had declined to pay or commit to pay the estimate for the e-mail search, this Court lacked jurisdiction over that portion of the plaintiff's request. Id. The Court denied defendant's motion, and held that

> In the May 1, 2001 FOIA request, Plaintiff committed to 'pay all applicable processing and copying fees.' ... Plaintiff has subsequently paid or committed to pay all fees requested by Amtrak, except for a $17,000 fee that was retracted by counsel for Amtrak at the initial hearing in this case. Further, within 45 days of Amtrak's request for commitment to pay a specific amount to search e-mail records, ... Plaintiff committed to that amount – both the $4,000.00 in estimated

costs associated with design of the e-mail collection process and between $6,232.00 and $7,790.00 estimated to search defendant's e-mail records.

Order dated September 20, 2002 at p. 2.

Notwithstanding the Court's Order, the defendant reiterated this argument on two subsequent occasions in this litigation. *See,* Defendant's Motion to Stay Consideration of Plaintiff's Motion for Summary Judgment dated December 5, 2002, at pp. 8-9, and Defendant's Motion for Summary Judgment dated January 15, 2003, at pp. 14-18. The Court again rejected this argument. The defendant's continued adherence to this untenable position in the face of three prior adverse rulings from this Court on this identical issue cannot be countenanced.

### A. Plaintiff's alleged failure to comply with 49 C.F.R. § 701.11(i)(3) does not constitute "abandonment" of its request for e-mail and other electronic data.

The defendant argues that the plaintiff's failure to comply with Amtrak's FOIA regulations constitutes abandonment of plaintiff's request and mandates that this Court dismiss these requests. Neither the plain language of the Regulations or the case law cited by the defendant support this argument.

Amtrak cites to 49 C.F.R. § 701.11(i)(3) for the argument that the plaintiff has "abandoned" its e-mail and electronic data requests. This regulation requires Amtrak to hold "in abeyance" for 45 days certain requests for which Amtrak's regulations require advance payment or deposit. In its memorandum, Amtrak cites subsections (1), (3) and (4) of that portion of its regulations dealing with advance payments. *See,* Amtrak Mem. at p. 9. Curiously, Amtrak has chosen to omit any reference to subsection (2), which is that

portion of the regulations actually dealing with the circumstances under which advance payment may be required. Subsection (2) provides:

> When there is evidence that the requester may not pay the fees that would be incurred by processing the request, an advance deposit may be required. Amtrak may require the full amount due plus applicable interest and an advance payment of the full amount of anticipated fees before beginning to process a new request or continuing to process a pending request where a requester has previously failed to pay a properly charged FOIA fee within thirty (30) days of the date of billing. The time limits of the FOIA will begin only after Amtrak has received such payment.

49 C.F.R. § 701.11(i)(3). Other than the current electronic data issue, the plaintiff in this case has either paid or committed to pay all reasonable fees assessed against it. To date, the plaintiff has paid over $18,000.00 - representing payment of all fees other than the electronic data fee that is the subject of defendant's motion. Furthermore, as many of the fee issues currently in dispute between the parties are caused by Amtrak's own failure to comply with the very regulations it accuses plaintiff of violating, its position on this issue is indefensible.

Nor does the case law provide support for the defendant's "abandonment" argument. None of the cases cited by the defendant involve the regulation upon which the defendant relies, and, in fact, one does not even involve the FOIA. The defendant first cites Judicial Watch of Florida v. Dep't of Justice, 159 F.Supp.2d 763, 764 (D.D.C. 2001). In that case, the agency responded to the plaintiff's FOIA request by suggesting that narrowing the request would speed up processing. Rather than respond, the plaintiff immediately filed suit. Due to the volume of responsive records located, and the fact that the plaintiff had failed to pay outstanding fees from a prior FOIA request, the defendant would not process the request until the fees from the earlier request were received. Id.

The plaintiff never responded to this request, nor to an additional notice stating that the request was considered "suspended" pending receipt of previously owed fees. Id.

One year after the plaintiff filed suit, the court noted that other than filing its appearance, the plaintiff had taken no action whatsoever in the litigation. Id. When the defendant told the Court that the parties had reached an impasse over the fee issue, and that the agency intended to file for summary judgment, the Court ordered the plaintiff to inform the defendant whether or not it intended to pay the fees. After the agency filed a lengthy motion for summary judgment, the plaintiff responded by "withdrawing" that portion of its request involving the disputed fees. The Court held that

> in the context of plaintiff's handling of this whole matter, however – from its failure to respond to the INS invitation to narrow its request, to its failure to prosecute the case at all until prodded by the Court, to its fork-tongued response to the Court's order that it notify the government whether or not it would pay the duplication fees – the maneuver is not funny, and is indeed sanctionable. I find that Judicial Watch has abandoned its FOIA request.

Id. The conduct of the Moye O'Brien firm is the opposite of Judicial Watch. Not only has Moye, O'Brien prosecuted this litigation vigorously and continuously, it has paid or agreed to pay every reasonable fee assessed against it thus far. The parties' dispute regarding fees arose only after Amtrak's initial estimates increased exponentially, and the plaintiff learned that the defendant had actively destroyed potentially responsive email records, thereby necessitating the enormous fees it now demands.

The defendant's citation to COMSAT Corp. v. National Science Foundation, 190 F.3d 269 (4th Cir. 1999) is even more unpersuasive. The issue in COMSAT was whether the Federal Arbitration Act authorizes an arbitrator to subpoena third parties for the

purposes of conducting pre-hearing discovery. The nonparty agency sent a letter to COMSAT's counsel explaining that its decision not to comply with the subpoenas was buttressed by the fact that the majority of the subpoenaed documents had been the subject of a FOIA request by COMSAT to the agency. Id. The Court noted that "NSF had suspended its efforts to comply with that voluminous request because COMSAT had been delinquent in paying the associated photocopying charges." Id. The court then considered the issue of whether the party seeking third party discovery could establish that it had a "substantial need" for the information. The Court held that

> we do not now attempt to define 'special need', except to observe that at a minimum, a party must demonstrate that the information it seeks is otherwise unavailable. ... As COMSAT acknowledged, many if not all of the documents it sought were obtainable ... with a FOIA request. In fact, the record indicates that prior to filing its petition to compel, COMSAT obtained hundreds of responsive documents from NSF via the FOIA process, continuing up to the point when COMSAT abandoned its FOIA request by ceasing to pay photocopying charges.

Id. at p. 276. These two sentences from the 4th Circuit opinion comprise the totality of the court's "analysis" of the peripheral FOIA issue. This case provides no support for the argument that the plaintiff has "abandoned" its electronic data requests in the present litigation.

Unlike the COMSAT case, Cazalas v. Department of Justice, 660 F.2d 612 (1981) does actually involve the FOIA, though what the case has to do with the issues of abandonment is utterly mystifying. Amtrak provides the following "summary" of the Cazalas case: "FOIA request to FBI for results of background investigation 'was eventually abandoned because Cazalas failed to provide the signature card that the FBI required to release this file.'" Def. Mot. to Dismiss at p. 9. The actual issue in Cazalas

was whether the District Court erred in failing to award plaintiff her attorneys' fees in her underlying FOIA action against the United States Attorney's Office. In a footnote, the Court noted that "Cazalas's official personnel file also contained a background investigation that was conducted by the FBI, and Cazalas's request was referred to the Bureau. This request, however, was eventually abandoned because Cazalas failed to provide the signature card that the FBI required to release this file." Id., n. 2. The plaintiff's deemed "abandonment" in Cazalas for failure to provide a signature card for the release of records from an agency to which she had never submitted a request in the first place provides no support for Amtrak's argument here.

### B. Factual History of Amtrak's Response to E-Mail Request.

In addition to this lack of legal authority, the facts regarding the impasse over fees and current dispute and the legal requirements imposed on Amtrak by the FOIA negate the argument that the plaintiff has abandoned this request. Since the date of the Court's original Order regarding the electronic data request, the parties have conferred in attempt to resolve the issue of the cost and method of processing these requests. Some of the basic history of these discussions is included with the defendant's motion. However, the defendant has omitted certain facts that explain the parties' inability to resolve this dispute on their own, resulting in the impasse brought to this Court's attention at the May 30, 2003 hearing. It is this history that makes the defendant's abandonment and failure to pay arguments particularly egregious.

One fact that is beyond dispute in this case is that the defendant's response to the plaintiff's original FOIA request was inadequate. Amtrak's own regulations require that a

response to a FOIA request be made within 20 days of receipt of the request. *See,* 49 C.F.R. §701.7(b). Not only did Amtrak fail to comply with this regulation, it took no action whatsoever to process any part of the plaintiff's request until this litigation commenced. Although Amtrak may have dealt in a dilatory manner with the documentary portion of the request, its action regarding electronic data was downright obstructionist. In fact, Amtrak admitted that it had done nothing to preserve electronic data requested by the plaintiff, and argued to this Court that it was under no legal obligation to do so. *See,* Def. Mot. to Dismiss dated August 30, 2002. Steven Emanuel, Amtrak's computer technology manager, testified that he was the first one to be involved in the search for these records, and that his involvement commenced in March or April of 2002, nearly a year after the plaintiff's request was made. Emanuel Dep. at pp. 49-50, 152.

At this Court's direction, the parties engaged in a series of telephone conferences aimed at reaching an agreement on how to process the plaintiff's electronic data requests. During the course of one such conference on August 1, 2002, it became evident that Amtrak had dismantled the computer system in place when the plaintiff's FOIA request was received, and that Amtrak was allowing employees to erase potentially responsive e-mails. When this was discovered, this Court entered an Order directing Amtrak to preserve e-mails and other electronic data. *See,* Court Order dated September 20, 2002. In response to the Court's Order, Mr. Emanuel contacted employees who might likely have responsive e-mails and directed them to preserve them. Emanuel Dep. at p. 156. This effort commenced in September 2002, over a year and a half after the plaintiff's

original request was filed. During this time, two events had occurred: 1) Amtrak employees, unaware of any need to preserve their e-mails, were free to delete responsive e-mails and electronic documents; 2) Amtrak dismantled the Novell based system in place when the plaintiff's request was made. Unfortunately, Amtrak's lengthy delay has resulted in a loss of data and the ability to recover that data that lies at the center of the controversy presently before the Court.

The parties' current disagreement over fees has stemmed largely from both the drastic increase in the original "estimates" provided by Amtrak, as well as the fact that a large portion of the costs being charged to the plaintiff have been caused by Amtrak's patently dilatory response to the plaintiff's requests. As discussed *infra*, many of the costs associated with the search and retrieval of e-mails are necessitated by the fact that Amtrak dismantled an entire network containing potentially responsive e-mails **subsequent** to its receipt of plaintiff's FOIA requests. *See*, Amtrak letter dated October 24, 2002, attached as Ex. 2 to Amtrak Motion to Dismiss; Emanuel Dep. at pp. 94-95. Amtrak has decided that the plaintiff in this case should bear the astronomical cost of resuscitating a network that Amtrak destroyed during the very time period when Amtrak should have been, but was not, processing the plaintiff's FOIA request. Even more amazing is the fact that Amtrak permitted its own employees to delete potentially responsive computer data for over a year following the initiation of this litigation. In this instance, it is particularly egregious for Amtrak to cite to plaintiff's failure to follow Amtrak regulations as mandating dismissal of plaintiff's request.

C.   **Amtrak has failed to establish that it has met its burden pursuant to the FOIA to make reasonable efforts to process the plaintiff's request for e-mail and other electronic data.**

The purpose behind the enactment of the FOIA is well-established – the statute is intended to increase public awareness and access to government records, unless those records are exempt from disclosure pursuant to several narrowly defined categories. *See, e.g.* Nadler v. U.S. Dept. of Justice, 955 F.2d 1479, 1484 (11th Cir. 1992); Currie v. I.R.S., 704 F.2d 523 (11th Cir. 1983). Nor can there be any doubt that there is a presumption in favor of disclosure under the statute, and that the government bears a heavy burden in establishing the applicability of the exemptions. Id. In response to the recent rise in the use of computers, both within and without the government, in 1996, Congress enacted a series of amendments to the FOIA, entitled "Electronic Freedom of Information Act Amendments of 1996". *See,* H.R. Rep. 104-795, 1996 U.S.C.C.A.N. 3445. In connection with these amendments, the House Report details the following specific findings:

> (5) Government agencies increasingly use computers to conduct agency business and to store publicly valuable agency records and information; and
>
> (6) Government agencies should use new technology to enhance public access to agency records and information.

Id. at * 3448. 5 U.S.C. § 552(a)(3)(B) states that

> In making any record available to a person under this paragraph, an agency shall provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format. Each agency shall make reasonable efforts to maintain its records in forms or formats that are reproducible for purposes of this section.

10

Additionally, subsection (C) provides that "In responding under this paragraph to a request for records, an agency shall make reasonable efforts to search for the records in electronic form or format, except when such efforts would significantly interfere with the operation of the agency's automated information system." These sections require agencies "to make reasonable efforts to search for records kept in an electronic format." H.R. Rep. 104-795, *21, 1996 U.S.S.C.A.N. 3448, *3464. *See also,* FOIA Update, Fall 1996 (5 U.S.C. § 552(a)(3)(C) "promotes electronic database searches and encourages agencies to expend new efforts in order to comply with the electronic search requirements of particular FOIA requests.").

At least one court construing these amendments has held that "the statements reflect a Congressional choice to expand, rather than narrow, the agencies' obligations under the FOIA and to encourage government agencies to use advancing computer technology – such as zipping files – not only to conduct agency business and store data but also to 'enhance public access' to records." TPS, Inc. v. United States Department of Defense, 2003 WL 21263912 (9th Cir.(Cal.)). It is undisputed that, by their very definition, Amtrak had the records at issue (e-mail) in the form requested on the date of the plaintiff's initial request, and that compliance with the response requirements of Amtrak's own regulations would have avoided the situation that now exists.

D.  **Amtrak's affirmative action in dismantling its entire NEC Project Office computer network subsequent to the receipt of plaintiff's FOIA request does not represent the "reasonable" effort required by the statute, and the Court should order Amtrak to bear the cost of retrieving the data lost by Amtrak's own negligence.**

Throughout the construction of the Northeast Corridor Project, all of Amtrak's facilities relied on a Novell-based system for e-mails and electronic documents.[1] The plaintiff's May 2001 FOIA request arrived at a time when Amtrak was transitioning from this Novell based file server system to a Microsoft based server. At that time, the Novell system was still running in the NEC Project office in Old Saybrook, Connecticut. Emanuel Dep. at p. 122. Because the Old Saybrook office was scheduled to be closed, it was never converted to Windows, as were all of Amtrak's "permanent" offices. Id. Rather, the Old Saybrook system was simply disassembled. Id. at pp. 122-124. According to Mr. Emanuel, the system was disassembled in or around September 2001, five months after the plaintiff's FOIA request was received. Id. at pp. 94-95. Mr. Emanuel does not know who was responsible for actually dismantling the system, and also does not know the current whereabouts of the approximately 70 desktop units that were in use in that office. Id. at pp. 95-98. No log was ever kept as to where these units were sent. Id. The file server also disappeared, although Amtrak thinks (though it is not sure) that it has re-located it. Id. at pp. 36, 55-56.

---

[1] Novell is an operating system specially designed for computers operating in a networked environment. It provides the software that enables various desktop units, sometimes located in different cities, to communicate with a central storage unit or units known as a file server. Neither Novell nor Windows NT are themselves e-mail systems but rather amount to electronic pathways through which e-mails can be sent.

In Amtrak offices that were being converted to the new Windows environment, employees were asked to designate those e-mails they wanted converted to Windows and transferred to the new system. Emanuel Dep. at pp. 121-123. Any e-mails that were not so designated remained on the GroupWise servers or the back-up tapes. Id. Once the transition to Windows was complete, all the Novell hardware (except the file server found in New London) was either thrown out, or reconfigured and used only for parts. Id. at pp. 63-64. In May 2001, both systems were running in some locations and Amtrak still had a clear idea of where the decommissioned hardware and storage medium was located.

During this time Amtrak, like most computer owners, routinely backed up the content of its file servers. Emanuel Dep. at pp. 44-45. If something were to compromise its e-mail server, Amtrak's email could be re-created using the back-up tapes. Id. Some of these back up tapes have been located, meaning that even e-mails that were erased long ago could be recovered. Id. at pp. 57-58. However, shortly after Amtrak converted to Windows, it elected to go to a "real-time" back up, in which a duplicate computer linked by digital connections is constantly copying and over-writing the previous copy. Id. at p. 47. Mr. Emanuel does not know where the hardware drives for reading these back-up tapes is currently located. Id. at p. 45.

In essence, Amtrak wants the plaintiff to pay over $100,000 in advance to re-construct an old system that it improvidently dismantled in the face of a pending FOIA request. Because it is undisputed that Amtrak dismantled its entire Old Saybrook computer system after the plaintiff's FOIA request was received, the plaintiff should not have to bear the cost of reconstructing it. The Court should therefore Order Amtrak to

purchase whatever software and hardware is necessary to return the system to the functional situation in which it was on May 1, 2001 when the FOIA request arrived. As to both the old server and the tape drives, the Court should give Amtrak a date certain to put the hardware and software in place to enable it to 1) confirm whether they contain materials that are responsive and 2) a good faith estimate of the time to search for anchor bolts materials on those tape drives.

### E. Amtrak has not made the reasonable effort the FOIA requires it to make to process plaintiff's electronic data requests using Amtrak's current computer network.

In its October 24, 2002 letter, the defendant presented its estimate for retrieval of email off of its current Exchange System. Over and above any actual costs related to the plaintiff's request, Amtrak informed the plaintiff that it would be necessary for Amtrak to purchase both hardware and software upon which to run the request. This is so because Amtrak "does not have any excess hardware that is not currently in use, nor does it currently have any excess resources it can spare for the e-mail retrieval and collection project." Oct. 24, 2002 letter at p. 4. Amtrak admits that these "fixed" costs have no particular connection to the plaintiff's request in this case. Rather, "Amtrak determined that there are common tasks that would be necessary for any e-mail retrieval and collection process in the current Exchange E-mail System. Amtrak estimates that any e-mail retrieval and collection project would have approximately $25,000 in fixed hardware, software and labor costs." Id. In addition to these "fixed" costs, Amtrak provided the plaintiff with four "options" for different types of searches with costs ranging from $30,500.00 to $70,900.00.

14

Amtrak's position in this case, despite the clear Congressional mandate to agencies to increase their resources and efforts to comply with electronic data requests, is that it does not have one single computer that can be spared to process any e-mail request received pursuant to the FOIA, and that the plaintiff in this case should subsidize Amtrak's purchase of extra hardware to search Amtrak's own computer system. Amtrak does not deny that the records sought by the plaintiff exist in the format requested; it simply denies that it can spare the use of even one computer from its vast network to process the plaintiff's request. This certainly cannot be considered a "reasonable" effort to respond to plaintiff's request.

This same argument was rejected by the Court in <u>Schladetsch v. United States Department of Housing and Urban Development</u>, 2000 WL 33372125 (D.D.C.)). In that case, the plaintiff requested 7 specific categories of information from the agency and, although the agency admitted that its databases contained all the pieces of information requested, it argued that it was unable to produce the information in the compiled form requested by the plaintiff. <u>Id.</u> at *2. Specifically, "HUD has claimed that it would take 185 hours at a cost of $14,041.50 in order to comply with Mr. Schladetsch's request. ... It also claims that it is not obligated to comply because the request would require HUD to create a new record and would impose an 'unreasonable burden' upon HUD." <u>Id.</u>

The Court examined the applicable statutory language of 5 U.S.C. § 552(a)(3)(C), which mandates that "in responding ... to a request for records, an agency shall make reasonable efforts to search for the records in electronic form or format, except where such efforts would significantly interfere with the operation of the agency's automated

15

information system." Id. The Court held that "because an electronic search of computer databases does not amount to a creation of records ... it follows that the programming necessary to instruct the computer to conduct the search does not involve creation of a record. ... Because HUD has conceded that it possesses in its databases the discrete pieces of information which Mr. Schladetsch seeks, extracting and compiling that data does not amount to the creation of a new record." Id. at *3.

Because the Electronic Freedom of Information Act Amendments were intended to promote and encourage electronic searches, agencies are required to determine, "in any case in which a requested database search would involve new programming and database-retrieval efforts, whether those efforts are 'reasonable' under the particular circumstances." Id. The Court then considered the agency's arguments that it was not obligated to conduct the electronic search the plaintiff was requesting. HUD argued that it would be required to spend 185 hours processing the plaintiff's request, and that doing so would "cause significant interference and adversely impact the efficiency and effectiveness of the agency's computer systems." Id. at *4. Upon finding that the declarations submitted by the agency failed to adequately address the "significant interference" claimed by the agency, the Court held that "it must be concluded that HUD has not met its burden of showing that searching for the records sought by Mr. Schladetsch would require HUD to undertake 'unreasonable efforts' or that the search would 'substantially interfere' with HUD's computer system." Id. at *5. The Court granted plaintiff's motion for summary judgment on the issue of the scope of defendant agency's efforts to comply with the plaintiff's FOIA request.

Clearly, Amtrak's contention that it has no computer resources available to process **any** FOIA request for electronic data does not constitute the reasonable effort required by the statute. In addition, the plaintiff has presented this Court with evidence that a search of Amtrak's current email system can be accomplished for less than the cost estimated by Amtrak. *See* letter from Stroz Friedberg, LLC dated July 18, 2003, attached hereto. Therefore, the plaintiff requests an order from this Court that the defendant process the plaintiff's request upon receipt of payment from the plaintiff in an amount actually and reasonably necessary to process the plaintiff's request.

### III. <u>CONCLUSION</u>

After already unsuccessfully litigating the issue of fees and exhaustion of administrative remedies in this litigation three times, Amtrak attempts to persuade this Court that the Court should dismiss the plaintiff's request for e-mail and other electronic data. Having failed to take any step to preserve responsive records for over a year following receipt of plaintiff's request, as well as having affirmatively dismantled an entire computer network containing potentially responsive records several months subsequent to receipt of the request, Amtrak's current argument is patently frivolous. The record before this Court clearly establishes that the plaintiff has acted in good faith throughout this litigation, has paid or agreed to pay all reasonable fees assessed against it, and has attempted to resolve the fee issue regarding electronic mail and data with Amtrak to the best of its ability. The crux of the parties' current disagreement stems from the exhorbitant amount of Amtrak's recent "estimates", and the fact that these amounts need

only be incurred because of Amtrak's own dilatory behavior over the course of the last two years. The defendant's motion to dismiss should be denied.

RESPECTFULLY SUBMITTED,

CHRISTOPHER ROONEY
Federal Bar # ct04027
CARMODY & TORRANCE LLP
195 Church Street
P.O. Box 1950
New Haven, CT 06509-1950
(203) 777-5501 (telephone)
(203) 784-3199 (facsimile)
Plaintiff's Attorneys

_____
JAMES E. MOYE
Florida Bar No. 801356
ANTHONY R. KOVALCIK
Florida Bar No. 085588
MOYE, O'BRIEN, O'ROURKE, HOGAN
& PICKERT
800 South Orlando Ave.
Maitland, Florida 32751
(407) 622-5250
(407) 622-5440 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been furnished via U.S. Mail on this 21st day of July, 2003 to the following:

Arthur R. Goldberg, Esq.
James D. Todd Jr., Esq.
U.S. Department of Justice, Civil Div.
Federal Programs Branch
20 Massachusetts Avenue, N.W., Room 7310
P.O. Box 883
Washington, D.C. 20044


Paul I. Perez
United States Attorney
Ralph E. Hopkins, Esq.
Assistant United States Attorney
80 North Hughey Avenue, Suite 201
Orlando, Florida 32801

_____
ANTHONY R. KOVALCIK
Florida Bar No. 085588
MOYE, O'BRIEN, O'ROURKE, HOGAN
& PICKERT
800 South Orlando Ave.
Maitland, Florida 32751
(407) 622-5250
(407) 622-5440 (fax)

# ADDITIONAL ATTACHMENTS NOT SCANNED

**\*\* REFER TO COURT FILE \*\***